# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| KENNEDY BURKHALTER et al., | ) |
|---|---|
| Plaintiffs, | ) |
| v. | ) Case No. 14-CV-251-JED-PJC |
| THE STATE OF OKLAHOMA, ex rel. THE OKLAHOMA DEPARTMENT OF HUMAN SERVICES; et al., | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court are dismissal motions filed by defendants Edward Lake, Rebecca West, Joyce Porter, Julie Merritt, and Courtney Bolt (DHS Employees) (Doc. 78), the Oklahoma Department of Human Services (DHS) (Doc. 80), and Gregory Hawkins (Doc. 83).

## I. Plaintiff's Allegations

On her own behalf and as the next friend of her then-minor daughter, Kennedy Burkhalter, plaintiff Alvertis Finley sued the defendants in the Tulsa County District Court. The defendants thereafter removed the action to this Court based upon federal question jurisdiction. (Doc. 2 at 2). The following facts, which are alleged in the plaintiffs' Second Amended Complaint filed December 8, 2016 (Doc. 76), are taken as true for purposes of this decision.

While in DHS custody, Burkhalter, who at the time was 15 years old, was sexually abused and impregnated by her father, Gregory Hawkins. Burkhalter was in DHS custody because Hawkins had convinced her to assert false allegations that her mother had permitted men to have sex with her for money, and the State of Oklahoma had filed a deprived petition in Tulsa County District Court. Among other things, the deprived petition alleged that Hawkins failed to protect

Burkhalter from alleged sexual abuse and that Burkhalter's natural parents (including Hawkins) were not fit to provide a "safe and stable" environment.

On the day of the filing of the deprived petition, defendants Julie Merritt and Cortney Bolt placed Ms. Burkhalter in a temporary foster home with Cathryn Joan Collins. Collins was at the time employed by Zion Plaza Church, of which Hawkins was the president and pastor. DHS and DHS Employees knew that Collins was employed by the church. Hawkins had direct supervisory authority over Collins. While Burkhalter was in DHS custody and in the temporary care of Collins, the DHS Employees permitted Burkhalter to have unsupervised visitation with Hawkins even though (1) the deprived petition expressly named Hawkins and alleged that he failed to protect Burkhalter from sexual abuse and (2) DHS maintained a practice and custom of forbidding unsupervised visitation in such situations. None of the DHS Employees advised Collins, either in writing or verbally, that Hawkins was not permitted to have unsupervised contact with Burkhalter. Thus, Hawkins had ongoing, unsupervised contact with Burkhalter multiple times, during which he raped and ultimately impregnated her.

On January 25, 2013, Ms. Burkhalter's social worker at Will Rogers High School advised defendant Joyce Porter that Burkhalter had reported that Hawkins had repeatedly sexually abused her during her foster placement with Collins. The social worker also advised Porter that Hawkins had been picking up Burkhalter from school by himself. Despite that report, DHS failed to act immediately to remove Burkhalter from Collins's care to prevent further sexual abuse. DHS and DHS Employees continued to permit Hawkins to have unsupervised contact with Burkhalter during which time he continued to rape her. Despite the direct report of sexual abuse, the DHS did not immediately remove Burkhalter from the foster placement with Collins, but waited almost two weeks – until February 25, 2013 – to remove her and place her in the care of her biological

mother. Over eight months later, on October 11, 2013, Burkhalter – who was then 16 years old – gave birth to a baby boy. Blood tests confirmed that Hawkins is the baby's biological father. Plaintiffs believe that Hawkins impregnated Burkhalter in the 11 days between DHS's receipt of the school social worker's report of sexual abuse and the date that the DHS removed Burkhalter from Collins's care.

In short, the plaintiffs allege that DHS knew that Hawkins was an unfit parent who should not have been allowed unsupervised contact with Burkhalter, but DHS permitted him to have unsupervised contact with her, which provided him the opportunity to repeatedly abuse her sexually. Even after DHS was notified of Hawkins's sexual abuse, DHS continued to permit Hawkins to have unsupervised contact with Burkhalter. As a result, plaintiffs allege claims against DHS Employees, DHS, Hawkins, Zion Plaza Church, and Zion Child Care.[1] Plaintiffs' first count asserts a claim under 42 U.S.C. § 1983 and alleges that the DHS Employees violated Burkhalter's due process rights. Plaintiffs' second count is against DHS under the Oklahoma Constitution's due process clause. The third count is a negligence claim against Zion Plaza Church. The fourth count is a negligence claim against DHS and DHS Employees. The fifth count is against all defendants for intentional infliction of emotional distress. The sixth count is against Hawkins for assault and battery. The seventh count is against Zion Child Care for negligent retention and supervision. The eighth count is also against Zion Child Care but is for negligent failure to protect from danger on premises. DHS Employees, DHS, and Hawkins seek dismissal on all claims against them. Thus, Counts I, II, IV, V, and VI are currently at issue.

---

[1] The Zion-named defendants have not appeared or answered or otherwise responded to the Second Amended Complaint.

## II. Dismissal Standards

In considering a Rule 12(b)(6) motion to dismiss, the Court must determine whether plaintiff has stated a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The standard requires "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555-56, 570 (citations omitted). *Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). The Court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to claimant. *See Twombly*, 550 U.S. at 555.

The dismissal standard does "not require a heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id*. at 555-56, 570 (citations omitted). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]. And, of course, a well-pleaded [pleading] may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563.

**III. Claims against the DHS Employees**

The DHS Employees seek dismissal, arguing that plaintiffs have failed to state any claims against them in Counts I, IV, and V. The DHS Employees also assert qualified immunity as to the plaintiffs' claims under 42 U.S.C. § 1983.

**A. Counts IV and V: negligence and intentional infliction of emotional distress**

The DHS Employees move for dismissal of Counts IV and V. In their Response, plaintiffs concede that *Okla. Stat.* tit. 51, § 163(C) prohibits claims against the DHS Employees in their individual capacity for acts taken within the scope of their employment. Thus, plaintiffs "do not oppose dismissal of Counts IV and V against the DHS Employees." (Doc. 84 at 7). Therefore, the claims asserted in Counts IV and V against the DHS Employees are dismissed.

**B. Count I: claims under § 1983**

For the claims against the DHS Employees under 42 U.S.C. § 1983 (Count I), plaintiffs allege that the DHS Employees violated Burkhalter's rights under the Due Process Clause of the Fourteenth Amendment. The Due Process Clause does not establish a general protection from harm or violence by third parties. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). However, there are two exceptions to this general principle: (1) the special relationship doctrine; and (2) the danger-creation theory. *See Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012).

The special relationship doctrine applies when "the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Id.* (quoting *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011)). In *DeShaney*, the Supreme Court recognized that a foster placement "might" give rise to "a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." 489 U.S. at 201,

5

n.9. Thereafter, in 1992, "the Tenth Circuit explicitly recognized that foster children have a substantive due process right to 'protection while in foster care.'" *Schwartz*, 702 F.3d at 580 (quoting *Yvonne L. ex rel. Lewis v. New Mexico Dept. of Human Servs.*, 959 F.2d 883 (10th Cir. 1992)).

In the foster care context, the Tenth Circuit has recently explained the "special relationship" doctrine as follows:

> When a state fails to protect a foster child from harm, the foster child can sue the state under the special-relationship doctrine. The special-relationship doctrine provides an exception to the general rule that states aren't liable for harm caused by private actors. Under this doctrine, a state or its agents can be liable under 42 U.S.C. § 1983 for failing to protect people from harm if they have deprived those people of liberty and made them completely dependent on the state for their basic needs.

*Dahn v. Amedei*, 867 F.3d 1178, 1180 (10th Cir. 2017) (citing *DeShaney*, 489 U.S. at 199–200). "The special relationship triggers a continuing duty which is subsequently violated if a state official 'knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown,'" and the official's conduct shocks the conscience. *Schwartz*, 702 F.3d at 580-83 (quoting *Yvonne L.*, 959 F.2d at 890). This duty is not limited "to only those individuals involved in a child's initial placement." *Id.* at 582-83. "Conscience-shocking behavior evades precise definition and 'evolve[s] over time.'" *Id.* at 586. "Conduct is shocking to the conscience when the 'degree of outrageousness and [ ] magnitude of potential or actual harm [ ] is truly conscience shocking.'" *Id.* (internal quotations omitted).

Pursuant to the danger creation exception, "a state official may be liable when 'a state actor affirmatively acts to create, or increase[ ] a plaintiff's vulnerability to, danger from private violence.'" *T.D. v. Patton*, __ F.3d __, No. 16-1092, 2017 WL 3687935, at *10 (10th Cir. Aug. 28, 2017) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)). The Tenth Circuit

recently summarized the requirements for a plaintiff to establish a claim under danger-creation theory:

> To invoke the danger-creation theory, a plaintiff must show a state actor "affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *Currier*, 242 F.3d at 923; *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). If a plaintiff meets those preconditions, a plaintiff must next demonstrate:
>
> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
>
> (2) plaintiff was a member of a limited and specifically definable group;
>
> (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
>
> (4) the risk was obvious or known;
>
> (5) defendants acted recklessly in conscious disregard of that risk; and
>
> (6) such conduct, when viewed in total, is conscience shocking. *Currier*, 242 F.3d at 918 (spacing added).
>
> On the final element—whether the conduct is conscience shocking—neither ordinary negligence nor permitting unreasonable risks qualifies as conscience shocking. *Ruiz*, 299 F.3d at 1184. "Rather, a plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* (quotations omitted).

*T.D. v. Patton*, 2017 WL 3687935, at *10.

With the foregoing standards in mind, the Court will examine the particular allegations of the Second Amended Complaint as they pertain to each of the DHS Employees.

### 1. Edward Lake

Defendant Edward Lake, the Director of the DHS, is sued in his individual capacity in the Second Amended Complaint. (Doc. 76 at 2, ¶ 4). Plaintiffs allege that he "had supervisory responsibility to ensure that DHS adopts and implements policies that protect children in DHS custody from unreasonable risk of harm." (*Id.* at 8, ¶ 40). Based upon that duty, plaintiffs assert

7

that he violated Ms. Burkhalter's due process rights by "failing to ensure that DHS adopted and implemented a written policy [requiring] DHS staff to give written notice to caregivers of any restrictions on visitation of a child in DHS custody" and "[p]ermitting DHS staff to rely upon an unwritten custom and practice regarding visitation of children in DHS custody after the filing of a deprived petition, instead of adopting a formal policy to memorialize the custom and practice." (*Id.* at 8-9, ¶ 40.a, 40.b). There is no allegation that Lake had any direct involvement in, or knowledge of, either Burkhalter's initial foster care placement with her father's subordinate or with the continuation of that foster placement even after reports to other DHS Employees of sexual abuse by her father.

While the lack of a formulation of the specified written policies might be faulted in some way, it does not constitute a violation of the Fourteenth Amendment under the circumstances alleged. Lake's failure to adopt a written policy does not have the requisite nexus to the harm ultimately caused Ms. Burkhalter as a result of her father's sexual abuse and her resulting impregnation. Plaintiffs specifically allege that "DHS maintained a practice and custom of forbidding unsupervised visitation of children in DHS custody by any natural or alleged parent who is named in a deprived petition as a person who allegedly contributed to or caused the deprived conditions, until the allegations are investigated and cleared." (Doc. 76 at 5-6, ¶ 25). Lake's failure to memorialize in writing such a practice and custom is simply not outrageous or conscience shocking, as is required for both the special relationship and danger-creation theories, and that failure does not constitute affirmative action as required under the danger-creation theory. *See T.D. v. Patton*, 2017 WL 3687935, at *10. The Second Amended Complaint does not state a claim under § 1983 against Director Lake.

### 2. Joyce Porter

Ms. Porter "was a permanency placement supervisor responsible for supervising the placement of Ms. Burkhalter and developing a permanent placement plan for Ms. Burkhalter." (Doc. 76 at 2-3, ¶ 6). Plaintiffs allege that the social worker at Will Rogers High School advised Porter that Ms. Burkhalter had reported repeated sexual abuse by Hawkins while in the foster placement with Collins and also reported that Hawkins "had been picking Ms. Burkhalter up from school by himself." (*Id.* at 6-7, ¶ 30). Despite Porter's receipt of those reports, Ms. Burkhalter was not removed from the foster placement with Collins for almost two weeks, during which Burkhalter was again subjected to unsupervised contact with, and sexual abuse and impregnation by, Hawkins. (*Id.* ¶¶ 30-32). The allegations that Porter failed to timely protect Burkhalter, thereby subjecting Burkhalter to repeated, unsupervised contact with and sexual abuse by her father, is sufficient at the pleading stage to state a plausible claim under the special relationship doctrine. *See Schwartz*, 702 F.3d at 580-86.

### 3. Rebecca West, Julie Merritt, and Cortney Bolt

Plaintiffs allege that West was "responsible for monitoring and supervising DHS's placement of Ms. Burkhalter with a foster parent." (Doc. 76 at 2, ¶ 5). Merritt "was a district director for DHS and was responsible for approving Ms. Burkhalter's placement in foster care," and Bolt was the "case worker responsible for recommending the placement of Ms. Burkhalter with her foster parent." (Doc. 76 at 3, ¶¶ 7, 8). Plaintiffs further contend that "DHS, through the actions and decisions of Defendants Julie Merritt and Cortney Bolt (and possibly others at DHS), placed Ms. Burkhalter with a temporary foster parent, Cathryn Joan Collins." (*Id.* at 5, ¶ 22).

Plaintiffs also allege, generally, that all of the DHS Defendants "knew, at the time of Ms. Burkhalter's placement, that Collins was employed by Zion" and that "it was reasonably

9

foreseeable that Hawkins could use his position of authority over Collins to manipulate her to obtain unsupervised contact with Ms. Burkhalter." (*Id.* ¶¶ 23-24). Based on those allegations, plaintiffs allege that the placement of Burkhalter was "reckless and conscious [sic] shocking" and that those responsible for overseeing her foster placement put her in danger and violated their constitutional duties to protect her from harm. (*Id.* ¶ 24). Plaintiffs further contend that all DHS Employees except for Lake "breached their constitutional duties to Ms. Burkhalter by . . . [f]ailing to ensure that DHS advised Collins not to permit Hawkins to have unsupervised visitation" and "[a]llowing Hawkins to have unsupervised contact with Ms. Burkhalter while she was in DHS custody." (*Id.* at ¶ 41). According to plaintiffs, the DHS Employees knew of the risk that Hawkins would cause harm to Burkhalter, given that he was named in the deprived petition as being a danger to her. (*Id.* at ¶ 44). West, Merritt, and Bolt are also included within the allegation that, after the sexual abuse was reported, the DHS Defendants "continued to permit Hawkins to have unsupervised contact with Ms. Burkhalter during which time Hawkins continued to sexually abuse [her]." (*Id.* at ¶¶ 31-32).

Accepted as true, the foregoing allegations state claims against West, Merritt, and Bolt under the Due Process Clause, through the special relationship test and/or the danger creation theory. *See Schwartz*, 702 F.3d at 580-83; *T.D. v. Patton*, 2017 WL 3687935 at \*\*9-10.

### C. Qualified Immunity

The DHS Employees also seek dismissal on grounds of qualified immunity. Where qualified immunity is raised at the dismissal stage, the Court must accept all well-pleaded allegations as true and view them in a light most favorable to the plaintiffs. *See Schwartz*, 702 F.3d at 579. "To survive a motion to dismiss based on qualified immunity, the plaintiff must allege sufficient facts to show – when taken as true – the defendant plausibly violated [plaintiff's]

constitutional rights, which were clearly established at the time of the violation." *Id.* Thus, the first prong of the analysis is whether the allegations plausibly show that (1) "the defendant's actions violated a federal constitutional or statutory right," and (2) "the right was clearly established at the time of the defendant's unlawful conduct." *See T.D. v. Patton*, 2017 WL 3687935, at *8 (citation omitted). If the plaintiff fails to satisfy either prong of the inquiry, then the defendant is entitled to qualified immunity. *See id.* (citing *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)).

As the Court has determined that plaintiffs have not stated due process claims against Lake, he is entitled to qualified immunity on the § 1983 claim against him. With respect to West, Porter, Merritt, and Bolt, the Second Amended Complaint states plausible § 1983 claims for violations of Burkhalter's due process rights, such that the first prong of the qualified immunity analysis is satisfied as to them at this stage. Turning to the second component of the qualified immunity analysis, to show clearly established law, a plaintiff must generally identify a Supreme Court or Tenth Circuit opinion which existed at the time of the alleged violation. *Id.* The existing precedent "must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015)). While the precedent need not be "directly on point," *White*, 137 S. Ct. at 551, the "right's contours" must have been "'sufficiently definite that any reasonable official in [the official's] shoes would have understood that he was violating it.'" *T.D. v. Patton*, at *8 (quoting *City & Cty. Of San Francisco v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1774 (2015)). The right must not be defined at a "high level of generality," but "must be 'particularized' to the facts of the case." *Id.* at *9 (quoting *Sheehan*, 135 S. Ct. at 1776 and *White*, 137 S. Ct. at 552).

11

The Court has concluded that the Second Amended Complaint asserts claims against Porter, West, Merritt, and Bolt under the special relationship test or danger creation doctrine. The danger creation theory, in the specific context of state child protection officials, was clearly established by Supreme Court and Tenth Circuit authorities as of 1993, 1994, and 2001. *See T.D. v. Patton*, at **18-23. With respect to the special relationship test, the Tenth Circuit has noted that "[s]ince 1985, case law in this circuit and the established weight of authority has clearly established that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child or failed to exercise professional judgment with respect thereto," such that "the contours of foster children's constitutional rights were clearly delineated in this circuit." *Schwartz*, 702 F.3d at 588. In addition, the 1992 *Yvonne L.* decision "explicitly recognized that foster children have a substantive due process right to 'protection while in foster care.'" *Id.* at 580 (quoting *Yvonne L.*, 959 F.2d at 892-93). The alleged conduct by Merritt, Bolt, West, and Porter in this case occurred between early December, 2012 (when Burkhalter was placed with Collins) and February 5, 2013 (when that placement was terminated) – long after the law was clearly established. Accordingly, Porter, West, Merritt, and Bolt are not entitled to dismissal on qualified immunity grounds.[2]

---

[2] This determination of qualified immunity is made as to the *dismissal* stage. Although courts will consider qualified immunity at the dismissal stage, qualified immunity is more typically addressed in summary judgment. *See Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). Asserting qualified immunity at the dismissal stage subjects the defendant raising it to a more challenging standard than would apply at the summary judgment stage, because one is a pleading standard whereas the other involves evidence. *See id.* And, because "discovery may inform the context [of the individual defendants'] actions such that their behavior was not conscience shocking," the "'denial of qualified immunity at the dismissal stage does not preclude a renewal of that defense at summary judgment after further factual development has occurred.'" *Schwartz*, 702 F.3d at 587 (quoting *Weise v. Casper*, 507 F.3d 1260, 1265 (10th Cir. 2007)).

## IV. Claims against DHS

### A. Counts IV and V: tort claims

Counts IV and V of the Second Amended Complaint include claims against DHS for negligence and intentional infliction of emotional distress. Plaintiffs now "consent to the dismissal of Counts IV . . . and V . . . of the Second Amended Complaint as to DHS." (Doc. 85 at 7, n.1). Accordingly, Counts IV and V are dismissed as to DHS.

### B. Count II: due process claim under the Oklahoma Constitution

In Count II, plaintiffs claim that DHS violated Ms. Burkhalter's due process rights under Article 2, § 7 of the Oklahoma Constitution, which provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." The state constitutional provision parallels the Due Process Clause of the Fourteenth Amendment. In *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013), the Oklahoma Supreme Court determined that certain provisions of the Oklahoma Constitution may provide a private cause of action notwithstanding the provisions of the Oklahoma Governmental Tort Claims Act (GTCA). In order for a plaintiff to bring a *Bosh* claim, there must be no available cause of action under the GTCA. *See Perry v. City of Norman*, 341 P.3d 689, 693 (Okla. 2014). As noted, plaintiffs consented to the dismissal of the tort claims against DHS. (Doc. 85 at 7). Even had they not consented, those claims would have been dismissed because DHS is exempted from tort liability for any "claim based upon an act or omission of an employee in the placement of children." *Okla. Stat.* tit. 51, § 155(29); *see Deal v. Brooks*, 389 P.3d 375 (Okla. Civ. App. 2016). There is thus no claim available to plaintiffs against DHS under the GTCA in this case, and *Perry* thus does not prevent a claim under *Bosh*, if such a claim is otherwise cognizable under the Oklahoma Constitution.

During the pendency of this case, the courts of Oklahoma have continued to clarify Oklahoma law with respect to the scope of *Bosh*. After reading two such decisions from 2015 and 2016, which specifically related to claims against the DHS, the Court entered a Minute Order on July 19, 2016, stating that, if the defendants were to re-urge their dismissal motions following the plaintiffs' filing of the First Amended Complaint, "the parties' briefing shall include arguments and authorities in light of more recent decisions regarding claims asserted under *Bosh*, as well as any other recent authorities which may be applicable." (Doc. 43). The parties addressed those cases in their most recent briefing. The decision upon which the DHS principally relies – *GJA v. Okla. Dept. of Human Servs.*, 347 P.3d 310 (Okla. Civ. App. 2015) – bears the notation that it was released for publication by order of the Court of Civil Appeals, and it has not been released for publication by the Oklahoma Supreme Court. The decision upon which plaintiffs principally rely – *Deal*, 389 P.3d 375 – has been released for publication by order of the Oklahoma Supreme Court. The distinction makes some difference, in light of Rule 1.200 of the Oklahoma Supreme Court's Rules, which provides that opinions released for publication by the Oklahoma Court of Civil Appeals "shall be considered to have persuasive effect," while such decisions approved for publication by the Oklahoma Supreme Court "shall be accorded precedential value." Okla. Sup. Ct. R. 1.200.

The Court has considered both *GJA* and *Deal* and considers *Deal* to be more on point as to the plaintiffs' *Bosh* claim in this case. In *Deal*, the Oklahoma Court of Civil Appeals distinguished *GJA* on the basis that the plaintiff in *GJA* alleged a *Bosh* claim against the DHS based on a custodial arrangement that "was the result of a custody order in a divorce decree rather than the result of actions undertaken while the children were in the custody of DHS." *Deal*, 389 P.3d at 379. That distinction applies to the allegations of fact in plaintiffs' Second Amended Complaint, given that

DHS *was* responsible for the foster placement of Ms. Burkhalter during which she was raped and impregnated by her father. The court in *Deal* held that the DHS is not immunized "from liability for reckless and deliberate acts that deprive a child of her due process rights while in state custody." *Id.* The *Deal* court determined that state due process protections with respect to children in state custody are coextensive with due process protections under the United States Constitution. *See id.* at 386-91. The court then summarized its conclusion that, under the Oklahoma Constitution, when DHS employees violate a child's due process rights, "respondeat superior serves as a basis for liability against DHS under a cause of action arising from the due process clause of the Oklahoma Constitution." *Id.* at 391-92. The court in *Deal* determined that there were genuine issues of material fact "regarding a possible violation of the child's constitutional rights under the due process clause of the Oklahoma Constitution" and reversed the trial court's grant of summary judgment on the respondeat superior claim against the DHS. *Id.* at 392.

Because the Court has determined that the Second Amended Complaint states plausible due process claims against DHS Employees Porter, West, Merritt, and Bolt, the plaintiffs have stated a respondeat superior claim under the Oklahoma due process clause against DHS in accord with *Deal*.

## V. Hawkins's Dismissal Motion

### A. Untimeliness

Plaintiffs assert that Hawkins's dismissal motion is untimely, because he was served with the Second Amended Complaint on December 10, 2016, and he did not file any motion or otherwise respond within the time required under Fed. R. Civ. P. 12(a), (b). The motion by Mr. Hawkins (Doc. 83) was not timely filed, and thus his arguments are untimely. Even had his motion been filed in a timely manner, it must be denied for the reasons set forth below.

## B. Jurisdiction

Hawkins alleges that the Court lacks subject matter jurisdiction over the claims against him and cannot exercise personal jurisdiction over him. He provides no explanation or argument to support his jurisdictional contentions. (*See* Doc. 83). There is no question but that the Court has subject matter jurisdiction over claims in this case, because plaintiffs have alleged claims under 42 U.S.C. § 1983, such that original, federal question jurisdiction exists under 28 U.S.C. §§ 1331, 1343(a)(3). And the Court has supplemental jurisdiction over "all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." *Id.* As the Tenth Circuit has explained:

> Once a district court has jurisdiction, additional claims and parties can be added under the supplemental-jurisdiction statute, 28 U.S.C. § 1367(a), which grants the district courts jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." A claim is part of the same case or controversy if it "'derive[s] from a common nucleus of operative fact.'" *City of Chicago v. Int'l Coll. of Surgeons,* 522 U.S. 156, 165, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). . . . And § 1367(a) explicitly states that "supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."

*Price v. Wolford*, 608 F.3d 698, 702–03 (10th Cir. 2010). There is no question in this case that the claims against Hawkins derive from a common nucleus of operative fact to the plaintiffs' other claims. The Court thus has supplemental jurisdiction over the claims against Hawkins.

Hawkins has not explained the basis for his contention that the Court lacks personal jurisdiction over him. He has not challenged the service of process upon him, and he has not disputed that he is a "resident of Osage County," as is alleged in the Second Amended Complaint.

(Doc. 76 at ¶ 10). The return address of the envelope in which he mailed his motion indicates that he is incarcerated in Sayre, Oklahoma. Hawkins has not claimed that he has insufficient contacts with Oklahoma, and his citizenship in the state confers personal jurisdiction over him. Even were he not a citizen of this state, there is no question but that the claims against Hawkins arise out of conduct that he allegedly committed in Oklahoma. His personal jurisdiction argument is meritless.

### C. Failure to State a Claim

#### 1. Arguments referencing the Zion entities

Although Mr. Hawkins filed his motion to dismiss "Pro-Se in his indivisual [sic] capacity," he references defendants Zion Child Care & Learning Center and Zion Plaza Church throughout his motion. (*See* Doc. 83 at 2-3). Neither of the Zion entities have appeared in this case or filed responses to the Second Amended Complaint. It is well-settled that an individual such as Hawkins may not represent or appear for corporations such as the Zion defendants, and corporations may not proceed pro se through an individual who is not an attorney. *See, e.g., Tal v. Hogan*, 453 F.3d 1244, 1254-55 (10th Cir. 2006) ("It has been our long-standing rule that a corporation must be represented by an attorney to appear in federal court"); *Harrison v. Wahatoyas*, 253 F.3d 552, 556 (10th Cir. 2001) ("As a general matter, a corporation or other business entity can only appear in court through an attorney and not through a non-attorney corporate officer appearing pro se"); *DeVilliers v. Atlas Corp.*, 360 F.2d 292, 294 (10th Cir. 1966) ("[A] corporation can appear in a court of record only by an attorney at law"). Thus, Hawkins's arguments relating to the Zion entities will not be considered.

#### 2. The claims against Hawkins

Plaintiffs allege state tort claims for intentional infliction of emotional distress (IIED) (Count V) and assault and battery (Count VI) against Hawkins. The allegations of the Second

Amended Complaint – that Hawkins repeatedly raped and ultimately impregnated his daughter when she was 15 and 16 years old – unquestionably state claims against him under Oklahoma law for IIED and assault and battery.

To state a claim for IIED under Oklahoma law, the plaintiff must assert facts that plausibly allege that "(1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe." *See Schovanec v. Archdiocese of Okla. City,* 188 P.3d 158, 175 (Okla. 2008) (quoting *Comput. Publ'ns, Inc. v. Welton,* 49 P.3d 732, 735 (Okla. 2002)). The trial court must assume a "gatekeeper role" and make an initial determination that the alleged conduct "may reasonably be regarded as sufficiently extreme and outrageous" to maintain a claim for IIED. *Estate of Trentadue v. United States,* 397 F.3d 840, 856 n.7 (10th Cir. 2005); *see also Gaylord Entm't Co. v. Thompson,* 958 P.2d 128, 149 (Okla. 1998). The Court has no difficulty in determining that those elements are plausibly satisfied by the utterly shocking and horrific allegations against Hawkins in the Second Amended Complaint. *See, e.g., Smith v. Cochran*, 216 F. Supp. 2d 1286, 1299 (N.D. Okla. 2001) (IIED claim stated based on allegations that the defendant forced plaintiff to perform sexual acts).

"Under Oklahoma law, a battery occurs when the defendant acts with the intent of making a harmful or offensive contact with the person of the plaintiff and the act results in a harmful or offensive contact." *Courtney v. Okla. ex rel. Dept. of Pub. Safety*, 722 F.3d 1216, 1228 (10th Cir. 2013). And "[e]very battery necessarily includes an assault." *Id.* n.7. Again, the Court has no hesitation concluding that Ms. Burkhalter has stated a claim for assault and battery against Hawkins.

## VI. Conclusion

For the foregoing reasons, the Motion to Dismiss (Doc. 78) of defendants Lake, West, Porter, Merritt, and Bolt is **granted in part and denied in part**. The DHS's Motion to Dismiss (Doc. 80) is **granted in part and denied in part**. The motion to dismiss filed by Hawkins (Doc. 83) is **denied**. The claim in Count I against Director Lake is dismissed for failure to state a claim under § 1983, but Count I survives as to the other individual DHS defendants. Count IV, which was alleged against the DHS and Lake, West, Porter, Merritt, and Bolt, is dismissed in its entirety. Count V, which was asserted against all defendants, is dismissed only as to the DHS, Lake, West, Porter, Merritt, and Bolt, and survives as to all other defendants. This case will also proceed on all other claims (Counts II, III, VI, VII, and VIII) of the Second Amended Complaint.

SO ORDERED this 19th day of September, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE